**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ANDREW J. ISTVAN,**

**Plaintiff,**

**v.**

**Case No. 08-12507**
**HONORABLE DENISE PAGE HOOD**

**HONDA MOTOR COMPANY, LTD., *et al.*,**

**Defendants.**
**_____________________________________________/**

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING ACTION**

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on June 16, 2009. On July 15, 2009, Plaintiff filed an Answer to Defendant's Motion for Summary Judgment and Request for Additional Time to File Response and Brief. Defendants filed a Reply to Plaintiff's Brief in Opposition on July 21, 2009.

## II. STATEMENT OF FACTS

This case arises out of the death of Plaintiff's decedent in the crash of a motorcycle designed, manufactured and distributed by Defendants, which occurred on or about June 11, 2005 in Sarnia, Ontario, Canada. Plf.'s Compl., ¶ 5. At about 9:00 p.m. on this date, Plaintiff's decedent, Andrew J. Istvan, was the owner and operator of a 2002 Honda 954RR motorcycle and was driving southbound on Brigdon Road in the City of Sarnia, when the motorcycle went into an uncontrollable weave or wobble, went out of control and crashed. Plf.'s Compl., ¶ 7. Plaintiff raises the following claims against Defendants: (1) Negligence; (2) Negligence per se; (3) Breach of Express Warranty;

(4) Breach of Implied Warranty; (5) Products Liability; (6) Gross Negligence.

The original owner of the accident motorcycle was Samir Raval. He purchased the motorcycle in Chesterfield, Missouri on or about May 21, 2002. Mr. Raval sold the motorcycle to Plaintiff's decedent on May 2, 2003. Defendant's warranty records indicated that a product update campaign was completed in May of 2003 by Metro Power Sports in Canton, Michigan. See Defs.' Mot. for Summ. J., Ex. A.

Jonathan O'Neill was riding another motorcycle, a Yamaha R6, alongside Mr. Istvan. The road was a two lane asphalt-paved road in good condition. The day was warm, fair, and it was still daylight when the accident occurred. Mr. O'Neill was traveling on the right third of the lane in front of Mr. Istvan, who was traveling in the left third of the lane several motorcycle lengths behind Mr. O'Neill.

The accident was investigated by the Sarnia Police Department. In a signed statement given to the police on the day of the accident, Mr. O'Neill stated:

> We were driving approximately 100 km/h. I looked in my rear view mirror and I saw his front tire start to speed wobble.[1] I slowed down and he passed by me as I pulled to the right side of the road. As I looked at him from behind, his bike was wobbling back and forth and he started to pull to the right/west side of the road. I believe he rode the bike into the ditch and it flipped end over end 2 or 3 times.

*See* Plf.'s Resp., Ex. 1. Mr. O'Neill also gave a statement on June 16, 2005, where he indicated that he could have been traveling at sixty (60) to seventy (70) miles per hour (mph) when he saw Mr. Istvan's tire begin to wobble. Constable Szabo indicated that there appeared to be a dip in the road where the weave wobble marks occurred. During the accident sequence, Mr. Istvan was thrown

[1] Mr. O'Neill testified at his deposition that this statement was not in his handwriting. He further testified that he had no information as to why the motorcycle went out of control because when he first looked in his rear view mirror, the motorcycle was already in an unstable condition. See Def.'s Mot. for Summ. J., Ex. F at 31, 52.

from the motorcycle and sustained fatal injuries.

Mr. O'Neill testified that Mr. Istvan was not a risk taker, he had never witnessed him doing a 'wheelie,' nor had he ever seen him do an 'endo,' or maneuver wherein the front brake is applied hard and the motorcycle stops on its front wheel with the rear up in the air. *See* Plf.'s Resp. Ex. 18 at 15-16.

Plaintiff's expert, Dror Kopernik testified that he had discovered a March, 2002, Motorcyclist Magazine which contained an article referred to as a "first look" of the 2002 954 RR. *Id.*, Ex. 19 at 18-21. In that review, the article noted that in late December 2001, the motorcycle had gone into a violent snap of its bars on every lap while on a track in Europe. Several of the testers recommended that the bike have a steering damper. Two months later, in May of 2002, Defendant issued a Service Bulletin calling for its service employees to replace the steering stem components on this model "to enhance handling during high speed use such as closed course competition on a racetrack." *Id.*, Ex. 4.[2]

## III. APPLICABLE LAW & ANALYSIS

### A. Defendant's Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted in cases where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing no dispute as to any material issue. *Equal Employment*

---

[2] There is a question as to whether the motorcycle had received this upgrade. A dealer invoice indicates that it had, however the Service Bulletin directed the employee to make a punch mark at the beginning of the VIN number on the motorcycle when the upgrade had been completed.

*Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). A dispute must be evident from the evidence in order to deny such a motion. Such a dispute must not merely rest upon the allegations or denials in the pleadings, but instead must be established by affidavits or other documentary evidence. Fed.R.Civ.P. 56(e). When ruling, the Court must consider the admissible evidence in the light most favorable to the non-moving party. *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

**B. Defendants' Motion for Summary Judgment**

Defendants argue that Plaintiff cannot establish a material question of fact on the issue of defect. Defendants base this argument on the theory that Plaintiff's experts, Pedro Gregorio and Dror Kopernick, cannot provide admissible evidence to the trier of fact on the issue of whether the 2002 Honda CBR 954RR motorcycle was defective when it left the manufacturer's control. Specifically, Defendant maintains that Mr. Gregorio cannot be qualified as an expert with respect to motorcycle technology, handling or characteristics because he lacks experience with the accident motorcycle, and his job as a mechanical engineer has never entailed any design responsibility for any motorcycle in production nor for the testing of any motorcycle in production. Defendants further argue that even if Mr. Gregorio is qualified to testify as an expert in this matter, his testimony is still subject to exclusion as it is not based on reliable principles and methods. As to Mr. Kopernick, Defendants argue that he failed to provide an opinion on the issue of defect. As such, Plaintiff cannot prove his claims asserted in his Complaint.

To establish a claim for design defect, Plaintiff "must show that the product was 'not reasonably safe for its foreseeable uses' and that a 'risk-utility analysis' favored a safer design." *Croskey v. BMW of N.Am.Inc.*, 532 F. 3d 511, 515-16 (6th Cir. 2008). Plaintiff must show that (1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a 'feasible

alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users.'" *Id*. at 516 (citing MICH. COMP. LAWS § 600.5946(2)). Plaintiff may use direct or circumstantial evidence. *Id.*

Under Michigan law, the risk-utility test requires Plaintiff to show that: (1) the severity of the injury was foreseeable by the manufacturer; (2) the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product; (3) there was a reasonable alternative design available; (4) the alternative available design was practicable; (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and (6) that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe. *Id.* "An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to production of the product, at the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer." MICH. COMP. LAWS § 600.2946(2).

"Claims of breach of implied warranty and negligence in manufacturing or design may require the same proofs in certain circumstances." *Kenkel v. Stanley Works*, 256 Mich. App. 548, 556; 665 N.W. 2d 490 (2003). "However, 'the theories of negligence and implied warranty remain separate causes of action with different elements.'" *Id.* In order to state a claim for breach of implied warranty, Plaintiff must demonstrate that "a defect attributable to the manufacturer and causal connection between the defect and the injury or damage of which he complains." *Id.* Further, under an implied breach of warranty theory of recovery, a plaintiff is not required to establish a specific defect, a demonstration that the product failed to perform as represented or in

a manner reasonably consistent with its intended and foreseeable use is sufficient to support such a claim. *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 678 (E.D. Mich. 2002); *see also*, *Bouverette v. Westinghouse Electric Corp.*, 245 Mich. App. 391, 399; 628 N.W.2d 86 (2001).

A plaintiff can demonstrate a causal connection between the defect and the injury by "establish[ing] a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support. *Id.* at 560. "While plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation[.]" *Skinner v. Square D Co.*, 445 Mich. 153, 163; 516 N.W.2d 475 (1994). It is insufficient "to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." *Id.* at 164. In *Skinner*, the plaintiff was electrocuted while working in his shop. *Id*. at 157. The *Skinn*er court rejected the plaintiffs' offered scenario of how the defendant's defective electrical switch injured the plaintiff because plaintiffs' explanation was only a possibility, among countless others. *Id.* at 173. The plaintiff in *Skinner* had died immediately after the defendant's product allegedly malfunctioned, and there were no witnesses to the incident rendering the plaintiff's theory of liability speculative and insufficient to submit to a jury. *Id*. at 171-172.

To determine whether Plaintiff has presented a genuine issue of fact on his claims, the Court must first determine if Plaintiff's experts, on whom Plaintiff relies for support of his claims, meet the requirements of Federal Rule of Evidence 702. The Sixth Circuit has stated that, "[t]he admissibility of expert testimony is a matter of federal, rather than state, procedure." *Brooks v. Am. Broad. Cos*., 999 F. 2d 167, 173 (6th Cir. 1993). Federal Rule of Evidence 702 governs the admissibility of expert testimony. Expert testimony is admissible "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, [and the witness is] qualified as an expert by knowledge, skill, experience, training or education . . . .” Fed. R. Civ. P. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court set forth factors to be considered in determining whether to admit expert testimony involving scientific issues**.** The four factors are: 1) whether a theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error in using a particular and scientific technique and the existence and maintenance of standards controlling the technique’s operation; and 4) whether the theory or technique has been generally accepted in the particular scientific field. *Id.* at 593-94. The factors are neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case, such as issues involving non-scientific matters. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The factors will often be appropriate in determining reliability. *Id.* at 152. The trial court has broad latitude to determine whether these factors are reasonable measures of reliability in a particular case. *Id.* at 153.

To establish that Plaintiff’s proposed experts meet the requirements of Federal Rule of Civil Procedure 702, Plaintiff must show: 1) that the witness establish his expertise by reference to knowledge, skill, experience, training, or education; 2) the proffered testimony is reliable in that it is based on scientific, technical or other specialized knowledge; and 3) the expert’s testimony assists the trier of facts in understanding and disposing of the issues relevant to the case. *See* Fed. R. Civ. P. 702. This Court is required to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” *Daubert,* 509 U.S. at 589. In addition to the *Daubert* factors, the Court must assess “whether the testimony is based upon ‘sufficient facts or data,’ whether the testimony is the ‘product of reliable principles and methods,’ and whether the expert ‘has applied

the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F. 3d 517, 529 (6th Cir. 2008) (citing Fed. R. Civ. 702). While *Daubert* concerned the introduction of expert scientific testimony, the Sixth Circuit "has broadly applied *Daubert*'s relevance and reliability analysis to all evidence offered under Rule 702." *United States v. Harris*, 192 F. 3d 580, 588 (6th Cir. 1999).

The Court need not need address whether Mr. Gregorio is qualified to testify on the issue of motorcycle technology, handling or expertise, as the Court concludes that Plaintiff cannot set forth a prima facie case under either a negligence theory or breach of implied warranty theory, in part, based on the unreliability of Mr. Gregorio's testimony. When asked at his deposition whether the motorcycle involved in the accident was defective in design, he responded, "I guess my answer is yes, it was defective in design." *See* Defs.' Mot. for Summ. J., Ex. K, Dep. Tr. of Pedro Gregorio at 10. Mr. Gregorio further testified that the motorcycle was defective in design because it "was prone to having steering oscillations." Id. His basis for so concluding was that the motorcycle was designed "with a specific steering geometry that made it more sensitive to steering osciliations." Id. However, when asked to give "the precise engineering measurements or dividing line" between what would be acceptable geometry as opposed to defective geometry, he could not provide an answer. Id. at 19-20.

Mr. Gregorio testified that this design defect could be cured with the installation of a steering damper. Id. at 11. He could not identify the specific brand of steering damper that should have been installed. Id. at 11-12. Because he had only ridden a 2002 Honda 954RR once before, and was doing so for enjoyment, rather than testing performance, he had no knowledge of how a steering damper would have affected the performance of the motorcycle. Id. at 13.

Most troubling with Mr. Gregorio's testimony is that he opined "absent any other cause" he

believed the steering damper would have reduced the risk of encountering an unstable condition. Id. at 52. He indicated as to those other possible causes:

> [I]f you do a wheelie and come down from the wheelie with the front wheel at an angle or the handlebar turned when the front wheel touches the ground, that can induce a steering oscillation.
>
> * * *
>
> If the dip [in the road] is severe enough or if the input is enough to induce the oscillation, together with–there could be other factors: For example, is the motorcycle accelerating? Is it decelerating? If the motorcycle is accelerating, how hard is it accelerating? The front wheel, the harder it accelerates, the lighter and the less weight is going to be on the front wheel and the more susceptible the front wheel is going to be to those oscillations.

*Id.* at 52-53. Additionally, in reaching his conclusion, Mr. Gregorio did not examine the accident motorcycle, nor review the two thousand (2,000) plus pages of testing documents concerning motorcycle handling, stability, and running tests provided to him by Defendants, while conceding that review of such materials would be a reasonable expectation of anyone reaching a conclusion as to a design defect. *Id.* at 15, 17-18. Mr. Gregorio's theory that a high speed wobble can occur at speeds of sixty-five (65) to seventy-five (75) mph has not been subjected to any peer review, and is in direct contradiction to Mr. Kopernik's testimony that high speed wobble does not occur at such speeds. *Id*., Ex. L, Dep. Tr. of Dror Kopernik at 42-44. Based on all of the above, the Court concludes that Mr. Gregorio's testimony is unreliable and therefore inadmissible under *Daubert*.

As to Plaintiff's other expert, Mr. Kopernik, his testimony does not complete where Mr. Gregorio's is lacking. Mr. Kopernik cannot assist the trier of fact in this case:

Q. Was Mr. Istvan's motorcycle defective as it left the control of Honda?
A. I don't know. I don't know. I don't have enough information as of now.

*See* Defs.' Mot. for Summ. J., Ex. L at 4. When questioned as to why he had not formulated his conclusion, Mr. Kopernik indicated that he wanted to see documents from Defendants, documents

he had discussed with Plaintiff's counsel months before. *Id.* at 4-7. Also of note is the fact that Mr. Kopernik testified that after inspection of the subject motorcycle, he found that the steering stem bearings on the accident motorcycle were loose and the swing arm bearing on the motorcycle was loose. *Id.* at 35-37. However, he could not state with a reasonable degree of scientific probability whether the bearing looseness existed at the time the motorcycle left Defendant's control or was a result of the accident. *Id.* at 40-44.

As to Plaintiff's design defect claim, because Mr. Gregorio is the only expert to testify on the second element or alternative design, even if Plaintiff could establish that the motorcycle was defective at the time it left Defendant's control, Plaintiff cannot present a genuine issue of fact on the issue of whether a feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product. *See* MICH. COMP. LAWS § 600.5946(2).

As to both theories of liability, design defect and breach of implied warranty, Plaintiff cannot establish the causation element with sufficient evidence. Plaintiff has presented insufficient evidence on this issue. The only person witnessing the accident was Mr. O'Neill, who can only testify as to what he witnessed once the motorcycle was already in an unstable condition. Mr. Gregorio identified a host of factors that could have caused this condition. The jury will be left to decide what caused Mr. Istvan's accident with equally supportable theories. It is "[in]sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." *Skinner*, 445 Mich. at 516. In this matter, there is an absence of sufficient circumstantial evidence that explains why Mr. Istvan lost control of his motorcycle. Therefore, Defendants'

Motion for Summary Judgment is granted.[3]

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment **[[Docket No. 40, filed June 16, 2009**] is GRANTED.

IT IS ORDERED that Plaintiff's Motion to Supplement Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment Based on Deposition of Osamu Kikuchi Taken on August 26, 2009 [**Docket No. 51, filed on October 6, 2009**] is DENIED.

IT IS FURTHER ORDERED that this cause of action is dismissed.

IT IS SO ORDERED.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: March 25, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 25, 2010, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager

[3] On October 6, 2009, Plaintiff filed a Motion to Supplement Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment Based on Deposition of Osamu Kikuchi Taken on August 26, 2009. Defendant filed a Brief in Opposition to Plaintiff's Motion on the same date. The Court denies Plaintiff's Motion. Plaintiff's Motion does not inform this Court as to what specific information from Mr. Kikuchi's deposition will support Plaintiff's Opposition to Defendants' Motion for Summary Judgment.